

# In the Missouri Court of Appeals
# Eastern District

### DIVISION ONE

| | | |
|---|---|---|
| HELEN Y. SMITH, | ) | No. ED106603 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Steven R. Ohmer |
| KEYSTONE MUTUAL INSURANCE CO., | ) | |
| | ) | |
| Appellant. | ) | FILED: June 25, 2019 |

Keystone Mutual Insurance Co. ("Keystone") appeals from the trial court's judgment, following a jury trial in which Keystone was the defendant insurance company in an action brought by Helen Y. Smith, the widow of a deceased patient of Dr. Wallace Berkowitz, who had been insured by Keystone for a time. We reverse the trial court's judgment and remand with instructions.

## I. Background

Dr. Berkowitz, an ear, nose, and throat physician, applied for insurance with Keystone, which focuses its business on insuring physicians in a small number of low-risk specialties, such as ear, nose, and throat physicians. In 2009, Keystone agreed to insure him and his private practice for 2010, and the policy was renewed in 2011. A dispute later arose between the parties, which culminated in the parties entering into an agreement in March 2011, which, among other things, mutually rescinded the insurance policy and waived all of Dr. Berkowitz's and his private

practice's claims against Keystone (the "Agreement"). The facts of this Agreement will be discussed in greater detail during the discussion of the points below.

Helen Smith ("Smith"), widow of Johnnie Ray Smith, the deceased patient of Dr. Wallace Berkowitz, filed a wrongful death lawsuit against Dr. Berkowitz in 2010. A jury entered a verdict in favor of Smith in February 2013, awarding $1 million plus interest, which was reduced later to $680,000 with taxable costs and interest. Dr. Berkowitz filed for bankruptcy and received discharge in August 2016, which freed him from the obligation to pay the wrongful death judgment and hindered Smith's ability to collect from him. While Dr. Berkowitz was still in bankruptcy, Smith filed a petition against Keystone on May 9, 2014. Smith asserted six claims, including equitable garnishment under Section 379.200, RSMo.[1], fraud, bad faith, civil conspiracy, vexatious refusal to pay, and punitive damages.

On May 31, 2016, Dr. Berkowitz purported to assign all claims he had against Keystone to Smith. In return, Dr. Berkowitz received the right to 10 percent of Smith's recovery from Keystone.[2] On June 20, 2016, Smith moved for leave to file a First Amended Petition against Keystone, and Dr. Berkowitz and his practice joined in. The motion was granted and the First Amended Petition asserted five counts: Smith asserted equitable garnishment under Section 379.200, RSMo., and Smith and Dr. Berkowitz asserted the remaining claims of bad faith, fraud, vexatious refusal to pay, and punitive damages. Keystone answered and asserted a counterclaim with three counts: two counts requesting a declaratory judgment that Policy No. 09-056 was void *ab initio* and that the insurance policy was properly rescinded under the Agreement between Dr. Berkowitz and Keystone; and third, seeking a rescission to the extent that the policy was not already rescinded.

---

[1] All statutory citations are to RSMo. 2000 as updated, unless otherwise indicated.

[2] This provision is not in the assignment, but both Smith's counsel and Dr. Berkowitz acknowledge its existence.

The trial court entered partial summary judgment in favor of Keystone with respect to Counts I, III, IV, and V of the First Amended Petition. The court held on Count I that "plaintiff Smith may not maintain an equitable garnishment action" under Section 383.035.4. On Count II, the "bad faith refusal to pay" claim, the trial court explained:

> [I]t is patent from the record herein that Keystone had reasonable grounds to believe that Berkowitz had breach[ed] the insurance contract by concealing material information in his Application. There is nothing in the record to suggest that Keystone's conduct in this matter was based on any motive other than the belief that Berkowitz had made material misrepresentations concerning his claims history. Until the rescission agreement was signed, Keystone had supplied counsel and was defending the Smith claim. Further, there is no evidence on this record that Smith ever made a [settlement] demand on Berkowitz prior to the rescission agreement. Under the circumstances, the tort claim of "bad faith refusal to settle" is not viable.

On Count III, the trial court affirmed a prior ruling that Smith had failed to state a claim under Section 428.024 "because Keystone is not a debtor subject to the statute." The court also concluded that Section 375.144 "does not provide a private right of action for Plaintiffs' fraud claim."

For the vexatious refusal to pay claim, the trial court agreed that the relevant statutes are "inapplicable to Keystone." The court held that "the record here shows beyond dispute that Keystone had a reasonable cause or excuse to refuse to pay the Berkowitz judgment." That "excuse is that Berkowitz had apparently concealed or misrepresented his claims history in the Application, and the uncertainty of the application of Section 379.195 to Keystone meant that Keystone had a legitimate basis to seek rescission of its policy." In dismissing Smith's request for punitive damages, the court noted that Keystone's conduct "was far from outrageous."

The court, however, held that Count II of the First Amended Petition stated a claim for breach of an insurance contract, agreeing with Keystone that the breach of contract claim was governed by the five-year statute of limitations in Section 516.120. The court acknowledged that Dr. Berkowitz was "on notice that Keystone would refuse to perform its agreement when

3

presented with the rescission agreement" in March 2011, while the First Amended Petition, reflecting the assignment, was filed on June 20, 2016, more than five years later. The court concluded, however, that the assigned claim related back to the original petition filed by only Smith on May 9, 2014.

After this ruling, Smith sought leave to amend again and file a new three-count petition with new tort claims and alleging duress in connection with Dr. Berkowitz's execution of the settlement Agreement. The court granted this request as to Count I (breach of contract) only and denied Smith leave to assert additional claims, stating that the only viable claim is the breach of the duty to defend, which turns on the validity of the rescission Agreement, with no tort liability in this action.

Keystone moved for summary judgment based on the settlement Agreement and challenged Dr. Berkowitz's alleged duress. On November 29, 2017, the trial court entered partial summary judgment in favor of Keystone, holding that "the defense of duress is not viable on this record." Immediately before trial, Smith filed her Third Amended Petition asserting a single count, based on Dr. Berkowitz's assigned claim, for breach of his insurance contract. Other than incorrectly re-alleging that Dr. Berkowitz signed the settlement Agreement under duress, Smith asserted no other reason as to why it was not enforceable.

A five-day trial took place in January 2018, during which time Keystone moved for a directed verdict at both the close of Smith's evidence and at the close of all the evidence. Both were denied. Keystone proposed jury instructions and a verdict form with respect to its counterclaims, which were refused by the trial court and not submitted to the jury. The court submitted a single count to the jury for breach of the insurance policy contract, over Keystone's objection that the issue was whether Dr. Berkowitz, not the plaintiff, was damaged. The jury returned a verdict in favor of Smith in the amount of $870,625.23, with post-judgment interest of

9 percent. Keystone filed post-trial motions for judgment notwithstanding the verdict, for a new trial, and to reduce the damage award, as well as a motion for judgment on Counts I, II, and III of its counterclaim, which had not been decided. All of Keystone's motions were denied.

This appeal follows.

## II. Discussion

Keystone raises six points on appeal. First, it alleges the trial court erred in denying Keystone's motion for a directed verdict because Smith, as the assignee of Dr. Berkowitz, stood in Dr. Berkowitz's shoes and therefore had no right to recover for breach of contract, in that Dr. Berkowitz agreed in the settlement Agreement with Keystone that he had no coverage under the insurance policy and knowingly waived any breach of contract claim against Keystone before he assigned the claim to Smith.

Second, Keystone alleges the trial court erred in denying Keystone's motion for a directed verdict because the breach of contract claim was barred by a five-year statute of limitations, in that the parties entered into a settlement Agreement in March 2011 but Dr. Berkowitz never asserted the breach of contract claim before he assigned the claim to Smith in May 2016.

Third, Keystone argues the trial court erred in denying Keystone's motion for directed verdict because the insurance policy was void *ab initio*, in that Dr. Berkowitz made material false misrepresentations in the Application through his failure to truthfully list his claims history, hospital suspensions, and reprimand that might reasonably influence Keystone's decision to accept or reject the risk or charge a different premium.

Fourth, Keystone contends the trial court erred in submitting Instruction No. 6 to the jury and denying Keystone's request for a new trial because Instruction No. 6 misstated the law and confused the jury, in that the instruction told the jury to determine Smith's damages instead of

5

Dr. Berkowitz's damages when the breach of contract claim was an assigned claim from Dr. Berkowitz.

Fifth, Keystone alleges the jury's award is not supported by substantial evidence because Dr. Berkowitz never testified that his damages were $870,625.23, in that Dr. Berkowitz only testified to damages of $97,287.59, consisting of the $122,968.20 that he paid his attorneys after executing the settlement Agreement offset by the refund of $25,680.61 from Keystone.

Sixth and finally, Keystone alleges the jury's award is against the weight of the evidence because Smith's damages are limited to $97,287.59, in that Dr. Berkowitz testified that this amount represented his out-of-pocket loss ($122,968.20) as a result of the denial of his insurance coverage, less the $25,680.61 in refund.

## Point I: Keystone's motion for directed verdict

A.  Standard of Review

Generally, this Court reviews the "'denial of a motion for directed verdict as a question of law, viewed in the evidentiary light most favorable to the non-moving party, and determine[s] whether that party has made a submissible case.'" Damon Pursell Const. Co. v. Mo. Highway & Transp. Comm'n., 192 S.W.3d 461, 474 (Mo. App. W.D. 2006) (internal citations omitted).  In determining whether the trial court erred in overruling a motion for directed verdict, this Court must "consider all the evidence viewed in the light most favorable to the plaintiff," give the plaintiff the "benefit of all favorable inferences arising therefrom," and "disregard the defendant's evidence except insofar as it aids the plaintiff's case." Stout v. Cent. Nat'l Life Ins. Co., 522 S.W.2d 124, 128 (Mo. App. 1975).  When the claim of error on appeal is the failure to direct a verdict because of proof of an affirmative defense, however, the moving party is only entitled to a directed verdict if that party proved its affirmative defense as a matter of law. Wolfe v. State ex rel. Mo. Highway & Transp. Comm'n, 910 S.W.2d 294, 300 (Mo. App. W.D. 1995).

6

A "directed verdict should only have been granted if there were no factual issues remaining for the jury to decide." Id. Whereas Keystone is claiming that the trial court erred in failing to direct a verdict in its favor based on its affirmative defense that Dr. Berkowitz contracted away all claims he might have against Keystone, and therefore had nothing to assign to Smith, we review whether Keystone proved this affirmative defense as a matter of law.

Settlement agreements are governed by principles of contract law. Neiswonger v. Margulis, 203 S.W.3d 754, 760 (Mo. App. E.D. 2006). Matters of contract interpretation – including whether a contract is ambiguous – are questions of law to be reviewed *de novo* on appeal. Monsanto Co. v. Syngenta Seeds, Inc., 226 S.W.3d 227, 230 (Mo. App. E.D. 2007).

B. Did the Settlement Agreement Rescind All Rights of Dr. Berkowitz and his Assignee, Smith?

Smith argues that Keystone did not have the legal right to rescind Dr. Berkowitz's insurance contract, but we find that both Keystone and Dr. Berkowitz, together, contracted to rescind the insurance contract.

When interpreting any contract, a court must follow the terms of the contract as written if those terms are plain, unequivocal, and clear. Muilenburg, Inc. v. Cherokee Rose Design & Build, L.L.C., 250 S.W.3d 848, 853-54 (Mo. App. S.D. 2008). Unless an ambiguity is present in the contract, a court will not look outside of the four corners of the contract to determine the intent of the parties. Eisenberg v. Redd, 38 S.W.3d 409, 411 (Mo. banc 2001). If the essential terms of a settlement agreement are present in a contract and are sufficiently definite to enable a court to give them exact meaning, the contract will be found to be valid and enforceable even if some terms are missing or left to be agreed upon at a later time. Vulgamott v. Perry, 154 S.W.3d 382, 390-91 (Mo. App. W.D. 2004). "It is the most basic principle of contract law that parties are bound by the terms of the contracts they sign and courts will enforce contracts according to

7

their plain meaning, unless induced by fraud, duress, or undue influence." Nitro Distrib., Inc. v. Dunn, 194 S.W.3d 339, 349 (Mo. banc 2006).

During his completion of the application for insurance with Keystone in late 2009, even if Dr. Berkowitz disclosed to Keystone's Vice President of Sales, Tony Lyons, orally, or by writing, some or all of his past hospital suspensions, lawsuits, and reprimand from the Missouri State Board of Registration for Healing Arts, it is undisputed that Dr. Berkowitz signed the written application without such information being reported on the application itself and that Dr. Berkowitz did not suggest making any changes. When asked whether he had ever been directly or indirectly involved in "any claim, potential claim or suit arising out of the rendering or failing to render professional services," Dr. Berkowitz did not list numerous malpractice lawsuits that had been filed against him. Despite being sued more than 15 times, he listed a single lawsuit, Wilman, which resulted in a $200,000 settlement. Dr. Berkowitz did not list his hospital suspensions or a reprimand from the Missouri State Board of Registration for the Healing Arts that occurred in 2007, despite questions on the application asking whether he had ever been subject to reprimand, or been investigated by any hospital committee, state licensing or regulatory agency, or other medical review committee. Based on the answers in Dr. Berkowitz's application for insurance, Keystone issued a professional liability policy covering Dr. Berkowitz and his private practice for the year 2010.

Dr. Berkowitz did not report new events as they occurred, such as the January 2010 federal indictment for Medicare fraud, even though he had answered "no" on the application question asking if he had even been charged with, or indicted for, any crime, and Dr. Berkowitz

8

had agreed in the application to "immediately notify [Keystone] if there is any change in any of the answers, statements or particulars."[3]

In late 2010, Dr. Berkowitz applied for renewal of his insurance for the year 2011. Specifically, he certified that he reviewed his initial application dated November 6, 2009, and that "there have been no facts, matters or events that change any of [his] answers provided in the initial application." He further certified that the answers to the initial application questions remain correct, and that he had "no knowledge of any incident, circumstances, or potential adverse outcome that resulted, or may result, in injury or death, or in a claim, potential claim or suit involving [him] (even if such claim or suit may be without merit)." Keystone agreed to renew his policy for 2011.

On March 3, 2011, Keystone's chairman and CEO James Bowlin ("Bowlin") sent, via certified mail, a letter to schedule a meeting, "[c]onfirming our initial conversation of last Friday and my follow-up of earlier this week." The letter clearly stated, "[a]s [Bowlin] mentioned, [he] believe[d] it would be helpful for [Dr. Berkowitz] to have [Dr. Berkowitz's] personal counsel with [him] . . . ." Although Dr. Berkowitz testified that he did not bring his counsel with him to the March 7, 2011 meeting despite the letter's advice, he later consulted with his personal attorney, Mr. Bender or Mr. Carl Lang. Dr. Berkowitz also testified that during the March 7 meeting, Bowlin and Keystone's attorney gave him the rescission Agreement and read it to him. The Agreement covers both the 2010 and 2011 policies, and it mutually rescinded the insurance policy and waived all of Dr. Berkowitz's claims against Keystone.

The agreement provides, in part:

---

[3] Dr. Berkowitz did report to Keystone that he had been sued for malpractice in the lawsuit Smith v. Berkowitz, the case underlying this lawsuit here. Keystone provided a defense to Dr. Berkowitz and hired the law firm Eckenrode Maupin to represent him until Dr. Berkowitz and Keystone agreed to rescind the insurance policy. Dr. Berkowitz also reported to Keystone the case, Shea v. Berkowitz, for which Keystone also tendered a defense to Dr. Berkowitz and hired the same law firm. His application also disclosed a lawsuit that had resulted in a $200,000 settlement, Wilman v. Berkowitz.

9

Notwithstanding this right to rescind, in the interest of all parties, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Keystone and Berkowitz mutually agree to effect a termination of the Keystone policies under the following terms:

1. Berkowitz to Obtain Insurance; Rescission. Within 10 days of the date of this Agreement, Berkowitz shall obtain professional liability insurance from another professional liability insurer, and advise Keystone when such insurance has been obtained. In the event Berkowitz does not obtain such insurance within such time, the parties agree that Keystone shall and will rescind the Policies effective as of their dates of inception, e.g. December 31, 2009 as to the First Policy and December 31, 2010 as to the Second Policy.

2. Mutual Cancellation of the Policies; Waiver of Notice. In exchange for the agreements of Berkowitz herein, on the earlier of either the 10th day after the date of this Agreement or the date upon which Berkowitz advises Keystone that such insurance contemplated by Section 1 has been obtained, Keystone and Berkowitz mutually agree that the Policies shall be cancelled effective as of the initial date of such policies, e.g. December 31, 2009 as to the First Policy and December 31, 2010 as to the Second Policy . . . .

Additionally, the parties agreed that Keystone was not going to provide any insurance coverage, and would not cover any portion of the *Smith* lawsuit. Dr. Berkowitz said he understood that in signing the Agreement, he was "on the hook for any verdict rendered in *Smith*." Dr. Berkowitz understood that there was a mutual release by which both he and Keystone were giving up claims against each other. A confidentiality provision was included so that neither party would disclose any aspect of the Agreement or matter giving rise to the Agreement without prior written consent of the other party, which Dr. Berkowitz identified as critical to his decision to execute the Agreement.

The plain and unambiguous language of the Agreement in this case demonstrates the intent of the parties, that Dr. Berkowitz and Keystone clearly enter into a mutual Settlement Agreement in March 2011, at which time Dr. Berkowitz cancelled the Keystone insurance policies "effective as of the initial date of such policies, e.g. December 31, 2009." Berkowitz "acknowledge[d] and agree[d] that Keystone is not, and shall not, provide any coverage for [Smith v. Berkowitz], whether for defense thereof and/or for any damages adjudged against . . .

10

Berkowitz." Further, Dr. Berkowitz "will have sole responsibility for the cost of defense of [Smith v. Berkowitz] and for the payment of any damages or settlements connected therewith." Dr. Berkowitz agreed to, and did "waive any and all rights, claims, actions and causes of action Berkowitz may have in relation to Keystone, including, but not limited to, the right to pursue coverage under the Policies; [and] reimbursement of costs incurred and payments made in relation to [Smith v. Berkowitz] (whether for defense or damages)."

"We determine what the parties intended by what they said, and we cannot be concerned with what they may have subjectively intended to say." Promotional Consultants, Inc. v. Logsdon, 25 S.W.3d 501, 506 (Mo. App. E.D. 2000). Although we need not look beyond the clear language in the Agreement, even the parties' actions here confirmed their intent as clearly and unambiguously expressed in their Agreement. Dr. Berkowitz applied for new insurance on March 11, and upon obtaining it and consulting with his attorney, the rescission Agreement was signed on March 16, 2011. Dr. Berkowitz did not make any changes to the Agreement. Notably, the Agreement states, "The parties acknowledge they've had legal counsel's advice in relation to entering into this agreement," which did occur. Dr. Berkowitz testified that he received a check in the amount of $25,686 for reimbursement of his premiums from Keystone, which he cashed.

Accordingly, Dr. Berkowitz had no insurance coverage for the Smith v. Berkowitz lawsuit, and had waived all claims against Keystone. By giving up his insurance and claim for breach of contract, he received the promise of confidentiality, avoided future litigation that might result in a judicial rescission at a high cost and on the public record, and received a refund of premiums. Just as the trial court ruled prior to this judgment, this was not a case of fraud, duress or undue influence.

"The purpose of encouraging settlements would be frustrated if a party, following an apparent settlement, could avoid the agreement by instituting and prevailing in further litigation

11

by arguing that the settlement was ineffective because his legal position was sound." See Budget Rent A Car of St. Louis v. Guaranty Nat'l Ins. Co., 939 S.W.2d 412, 414-15 (Mo. App. E.D. 1996). Dr. Berkowitz (and his assignee Smith) cannot now avoid this Agreement by arguing it was ineffective because Keystone did not have the right to rescind the insurance policy at all.

Next, we find that Smith, the assignee of Dr. Berkowitz, is bound by the settlement Agreement entered into by Dr. Berkowitz. An assignment is the transfer of a cause of action to another, vesting legal title in the assignee, together with the right to maintain an action in his or her own name as the real party in interest. Kroeker v. State Farm Mut. Auto. Ins. Co., 466 S.W.2d 105, 109-110 (Mo. App. 1971). "The only rights or interests an assignee acquires are those the assignor had *at the time the assignment was made*." Renaissance Leasing, LLC v. Vermeer Mfg. Co., 322 S.W.3d 112, 128 (Mo. banc 2010) (emphasis added). "If there can be no recovery on the part of the insured, . . . there can be no recovery on the part of his assignee, . . . who would stand in his shoes."

In Hellmann v. Sparks, 500 S.W.3d 252, 268 (Mo. App. E.D. 2015), an agreement to relocate a community dock was orally rescinded before the rights under the agreement were assigned to the plaintiffs, property owners in a residential subdivision. The Court of Appeals stated:

> The trial court's determination that there was no agreement to relocate the community dock was correct because the parties to the original agreement to move the community dock had mutually rescinded that agreement *prior* to the time the [plaintiffs] received their assignment of [the assignor's] rights under those contracts.
> . . . .
> At the time the [plaintiffs] purchased the property and [the assignor] made the assignment of his rights under the agreement to relocate the community dock, the agreement to relocate the community dock had already been rescinded. Consequently, it was as if the agreement had never existed, and there was nothing to transfer to the [plaintiffs].

Id.

12

We find <u>Hellman</u> to be instructive in that Dr. Berkowitz's insurance policy with Keystone had been mutually rescinded prior to the time Smith received her assignment of Dr. Berkowitz's rights under the insurance policy. Whereas Dr. Berkowitz had no right to Keystone's coverage and waived any breach of contract claim against Keystone, he could not pass coverage or claims on to Smith. Thus, the trial court erred in refusing to enter a directed verdict in favor of Keystone in Smith's lawsuit. Keystone's first point is granted and the trial court's judgment is reversed and remanded with instructions that the trial court enter a directed verdict for Keystone.

Because the trial court must enter a directed verdict in favor of Keystone, we need not discuss Keystone's remaining points on appeal.

**Conclusion**

We reverse the judgment and direct the trial court to enter judgment in favor of Keystone.

 

_____
ROY L. RICHTER, Presiding Judge

Robert M. Clayton III, J., concurs.
Angela T. Quigless, J., concurs.